UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RANDALL S. OAKSTONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-03-164-B-W |
| | ) | |
| POSTMASTER GENERAL, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Randall Oakstone brought suit against the Postmaster General under Title VII for sex discrimination, harassment and retaliation, claiming the Postal Service took adverse employment actions against him in response to a female co-employee's false complaint of physical abuse. On December 29, 2003, the Postal Service filed a motion to dismiss and in the alternative, a motion for summary judgment. The Court denied the motion on August 18, 2004. Hoping for better luck the second time around, the Postal Service filed a second motion for summary judgment. This motion, however, meets the same fate for largely the same reasons. This Court DENIES the motion as to all Title VII claims, but GRANTS the motion to dismiss the claim for punitive damages.

### I.      Statement of Facts

The tempestuous love affair of Ramona Philbrook and Randall Oakstone ended badly and eventually impacted the work environment at the Postal Service's Eastern Maine Processing and Distribution Facility (Hampden Facility), where they were employed.[1] Discovery has focused on the contact between Mr. Oakstone and Ms. Philbrook and the

---

[1] The details of this affair and its denouement are set forth in this Court's August 18, 2004 Order and do not bear repetition here. *Oakstone v. Postmaster General,* 332 F. Supp. 2d 261, 263-66 (D. Me. 2004).

Postal Service's handling of Mr. Oakstone's requests for expediter work.  It has revealed the following additional facts.[2]

Randall Oakstone terminated a serious romantic involvement with Ramona Philbrook in April of 1997.  *Def. Statement of Undisputed Mat. Facts* at ¶ 54 (DSMF) (Docket # 42).  From then on, there was little direct contact between Ms. Philbrook and Mr. Oakstone, and what little there was, was stormy.  Postal Service employees and several managers were generally aware of the sour relationship between Mr. Oakstone and Ms. Philbrook.  DSMF at ¶¶ 63-64, 93, 219; *Pl. Opp. Statement of Mat. Facts* (POSMF) at ¶ 210 (Docket # 55).  On one occasion, Chris Parker, a supervisor at the Hampden Facility, told Mr. Oakstone to stay off a platform which was part of Ms. Philbrook's work area - despite Mr. Oakstone's protestations that he was searching for a form that was easiest to obtain in that area – telling Mr. Oakstone that the form could also be obtained elsewhere.  POSMF at ¶¶ 70-74; *Pl. Statement of Additional Mat. Facts* (PSAMF) at ¶ 304 (Docket # 55); *Def. Response to Pl. Statement of Additional Mat. Facts* at (DRPSMF) ¶ 304 (Docket # 62).  Chris Parker was aware of the troubled history between the two and was acting to prevent a conflict when he told Mr. Oakstone to leave the platform.  DSMF at ¶¶ 79-82.

In early 1999, Mr. Oakstone requested work as an expediter and after learning of his request, Ms. Philbrook objected to the extent that he would be doing that work during her shifts.  In her deposition, Philbrook testified that her EAP counselor had told her to stay away from him.  DSMF at ¶¶ 56-57; POSMF at ¶¶ 56-57.  In February of 1999, Ms.

---

[2] Consistent with the "conventional summary judgment praxis", the Court recounts the facts in a light most favorable to Mr. Oakstone's theory of the case consistent with record support.  *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 16 (1st Cir. 2002).  The Court has relied either on the uncontested facts or on Mr. Oakstone's version, if contested.  *See Oakstone*, 332 F. Supp. 2d at 263 n.1.

Philbrook vocalized her desire to avoid Mr. Oakstone to Carolyn Smith, the manager of distribution operations during 1998 and 1999, who had assigned him to train as a substitute expediter. *Id.* at ¶¶ 90, 93.[3]   Ms. Philbrook became visibly upset during this conversation, and told Ms. Smith that Mr. Oakstone had been abusive and that she was frightened of him. *Id.* at ¶¶ 93, 96-97.   Ms. Smith investigated her claims, but determined they were untrue. *See* DSMF at ¶¶ 132-36; POSMF ¶ 136.

Ms. Smith had not previously been aware of the acrid relationship between Ms. Philbrook and Mr. Oakstone and she had planned on assigning Mr. Oakstone work as an "inside expediter" which would necessitate working with Ms. Philbrook as "outside expediter." PSOMF at ¶¶ 102, 118.   Instead, in an effort to be fair to both of them, Ms. Smith decided to train Mr. Oakstone when Ms. Philbrook was not around, and as a compromise, offered to add "Sunday back-up platform expediter" to his job description. *See* DSMF at ¶¶ 155-56; PSAMF at ¶¶ 311, 350-51.   Mr. Oakstone had no special entitlement to perform expediter duties any other day.   DSMF at ¶ 162.   It was, however, expected that he would be needed to fill in other times.   PSAMF at ¶ 312.

Ms. Smith went on leave in March of 1999.   Around the same time, an expediter went on extended leave and the temporary expediter assignment was awarded to Mike Allison, a senior employee.   DSMF at ¶¶ 164-66.   Ms. Smith was replaced by Jeff Clark.   At some point during Mr. Clark's tenure, he learned about Ms. Philbrook and Mr. Oakstone's past, and made the decision that they would not be compatible working together.   He decided he would not allow Mr. Oakstone to be the inside expediter when Ms. Philbrook was the outside expediter.   DSMF at ¶¶ 183-84; PSAMF at ¶ 341.   Mr. Clark told Chris Parker to deny expediter work and expediter training to Mr. Oakstone because of the "conflicts"

---

[3] Whenever Ms. Philbrook met with management, she had a union representative with her.   DSMF at ¶ 100.

with Ms. Philbrook, but withheld this decision from Mr. Oakstone.  PSAMF at ¶¶ 342-43; DRPSMF at ¶¶342-43, 345.  Mr. Oakstone repeatedly requested information about his lack of expediter work and filed a grievance in September, 1999.  *Id.* at ¶¶ 340, 343, 356.

In November of 1999, Mr. Clark confirmed in writing that Mr. Oakstone would be given two days inside expediter training "at the first opportunity", which he estimated to be the end of the month.  DSMF at ¶ 215; POSMF at ¶ 215.  In December of 1999, Wallace Smyth, in management, received a complaint from Ms. Philbrook regarding plans to train Mr. Oakstone as an expediter.  DSMF at ¶¶ 25, 218.  Ms. Philbrook was very upset and told Mr. Smyth that if Mr. Oakstone expedited, she would punch out and leave.  She threatened to go to EEO and to her lawyer.  In response, Mr. Smyth gave her a "line in the sand" speech culled from his days as a Marine.  In response, Ms. Philbrook told him what he could do with his speech.  *Id.* at ¶¶ 225-227.

Shortly after, Mr. Smyth held a meeting with Mr. Oakstone and Ms. Philbrook and read them section 666.2 of the Employee Labor Manual, which provides that employees must work together in a professional manner.  Mr. Oakstone was receptive, but Ms. Philbrook laughed it off, remarking "I know what it says".  After that meeting, no member of management spoke to Ms. Philbrook about working opposite Mr. Oakstone as expediter.  *Id.* at ¶¶ 232, 237-42.  Subsequently, Mr. Smyth told Mr. Oakstone that Ms. Philbrook "had management over a barrel" because of the abuse allegations and that he could not work with her.  Mr. Smyth also emailed Louis Zedlitz, Plant Manager, that he was "taken hostage" when Ms. Philbrook raised the issue.  PSAMF at ¶ 368; DRPSMF at ¶ 368.

Contemporaneous with the Oakstone-Philbrook feud, the Postal Service introduced a Linear Integrated Package Sorter (LIPS) machine. In meetings with Mr. Oakstone's union, his job was identified as no longer needed because, in effect, it no longer existed. At least one other job was eliminated besides Oakstone's due to the LIPS and the impact of automation. Although it is not unusual for the Postal Service to abolish a position due to automation, the other eliminated job was not a manual rack job. *See* DSMF at ¶¶ 257-61, 270; POSMF at ¶¶ 257-61, 270. Adding Mr. Oakstone's second class mail work to LIPS required several people to perform his former work, because it was not feasible to do the work on the LIPS in an economically efficient manner. POSMF at ¶ 264; PSAMF at ¶ 375. Mr. Oakstone could have been reassigned at least temporarily, but was not. PSAMF at ¶¶ 372-74. After being informed in February of 2000 that his manual rack position was abolished, Mr. Oakstone was given insider expediter training in April of 2000. DSMF at ¶ 262; PSAMF at ¶¶ 359, 377; DRPSMF at ¶ 359.

During Mr. Oakstone's 1999 tenure at the Hampden Facility, two junior female employees were trained as expediters. Mary McBreairty was trained as a substitute expediter and May Brown was given expediter work as well. Ms. Brown was trained when Mr. Oakstone's requests for training were pending. POSMF at ¶ 6; PSAMF at ¶¶ 363-66; DRPSMF at ¶¶ 363-66. From February to September 1999, May Brown worked 68.75 hours, Mary McBreairty worked 8.17 hours, and Randall Oakstone worked 63.31 hours. From September 1999 through August 2000, May Brown worked 18.82 hours, Mary McBreairty worked 182.24 hours, and Randall Oakstone worked 243.85 hours. DSMF at ¶¶ 37-38. POSMF at ¶ 52. Though she did some expediter work while he was available, Ms. Brown worked a number of her expediter hours on Saturdays, Mr.

Oakstone's regular day off.  The Postal Service gives assignment priority to off duty individuals, not employees already at work on regular assignment, even though off duty employees would be entitled to overtime. POSMF at ¶¶ 49, 52.[4]

## II.    Discussion

### A.  Standard for Review

A moving party is entitled to a summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The First Circuit has defined "material" to mean "a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant."  *McCarthy v. Northwest Airlines, Inc.*  56 F.3d 313, 315 (1st Cir. 1995).  It has defined "genuine" as "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party."  *Id*.  The moving party must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The court is obligated to view the entire record "in the light most flattering to the nonmovant" and indulge "all reasonable inferences in that party's favor."  *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997); *see also Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990).  This Court has stated, however, that in discrimination actions, "caution is appropriate when considering summary judgment for an employer."  *Bilodeau v. Mega Indus.*, 50 F. Supp. 2d 27, 46 (D. Me. 1999).

---

[4] The Postal Service states it was within management's prerogative to use Ms. Brown as an expediter on Saturday and pay her straight time, rather than call in Mr. Oakstone and pay him time and a half, but Mr. Oakstone has denied this.  DSMF; POSMF at ¶ 49, 52.  Mr. Oakstone alleges other negative workplace effects of his relationship with Ms. Philbrook including: (1) Mr. Clark retaliating against his request for training by putting an extra load of work on his rack in October of 1999; (2) Mr. Clark leaving money on the floor to entrap him; and, (3) alienation by his co-workers and aberrations in his schedule. PSAMF at ¶¶ 370-71, 378.

**B.  Title VII:  42 U.S.C. § 2000e**

42 U.S.C. § 2000e provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[5] Title VII makes it illegal for an employer to discriminate against an employee on the basis of sex, to create a hostile working environment on the basis of sex, or to retaliate against the employee for making a charge of discrimination.  42 U.S.C. §§ 2000e-2, 3(a). The Postal Service challenges each of Mr. Oakstone's Title VII claims:  sex discrimination, sexual harassment, and retaliation.  In addition, the Postal Service argues that Mr. Oakstone's request for punitive damages must be dismissed as a matter of law.

**C.  Sexual Harassment**

**1.  Ramona Philbrook**

The Postal Service argues it is entitled to judgment since Mr. Oakstone is unable to establish the elements of a sexual harassment claim directly against Ms. Philbrook or indirectly against the Postal Service on grounds of employer liability.  Emphasizing Ms. Philbrook's non-supervisory position and Mr. Oakstone's concessions that he and Ms. Philbrook had little direct contact, the Postal Service argues that Mr. Oakstone's claim should be dismissed.  *Def.'s Mot. for Summ. J.* at 4-5 (Docket # 41).  In its Order on Defendant's Motion to Dismiss; however, this Court, relying on *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183 (11th Cir. 2001), held that since "Ms. Philbrook chose to use as her weapon a false allegation of male on female physical abuse", there was "sufficient evidence in this record from which a jury could conclude

---

[5]  Mr. Oakstone also invokes the provisions of 42 U.S.C. § 1981a, which provides for rights of recovery for violation of 42 U.S.C. § 2000e-16.  § 2000e-16 prohibits discrimination on the basis of sex in federal government employment, including specifically the United States Postal Service.  42 U.S.C. § 2000e-16(a).

that her choice of weapon was an act of gender-based harassment". *Oakstone,* 332 F. Supp. 2d at 271. The Postal Service has not offered any reason this Court should change its position. Indeed, Mr. Smyth's statement that Ms. Philbrook "had management over a barrel" because of the abuse allegations does not dispel, but reinforces this Court's previous conclusion. Consequently, although Mr. Oakstone makes no allegations of face-to-face harassment, this Court finds, consistent with its earlier Order, that the possibility that Ms. Philbrook harassed him by filing a false allegation of abuse is sufficient to survive summary judgment. *See id.* at 271-72 ("a jury could conclude that Ms. Philbrook, as a female, was making a charge against Mr. Oakstone, as a male, she knew would trigger an immediate and irreparable consequence for him, due to a stereotype about his gender").

### 2. Postal Service

Moving from Ms. Philbrook to the Postal Service, Defendant reaches the essence of its argument, extensively challenging this Court's "cat's paw" analysis. Relying on *Llampallas v. Mini-Circuits, Inc.,* 163 F.3d 1236 (11th Cir. 1998), *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001), and other authority, the Postal Service claims that if the cat's paw doctrine is to apply, Ms. Philbrook must have been the real decision-maker regarding Mr. Oakstone's employment or a Postal Service manager must have made his or her decisions in the shadow of Ms. Philbrook's approval and input. *Def.'s Mot. for Summ. J.* at 14-15. In other words, Ms. Philbrook must have had some sort of authority or control over Mr. Oakstone's employment.

Mr. Oakstone distinguishes between this case and *Pennington* and *Llampallas*. *Pl. Resp. in Opp'n. re Mot. for Summ. J.* at 14-16 (Docket # 54). The negative employment

decision in each case regarding the plaintiff was made after an independent determination by the decisionmaker, which severed the link between the retaliatory bias and the actions complained of.[6]  *Llampallas,* 163 F.3d at 1249-50; *Pennington,* 261 F.3d at 1270.  In *Llampallas*, the decisionmaker was wholly unaware of the motivating prejudice, and *Llampallas* emphasized that the meeting with management centered on the employee's work habits, not any previous sexual relationship.  *Llampallas,* 163 F.3d at 1249-50.

This Court agrees with Mr. Oakstone that *Llampallas* and *Pennington* are distinguishable in crucial respects.  Here, taking the allegations in the light most favorable to Mr. Oakstone, a jury could find that the supervisors not only knew of the relationship between Ms. Philbrook and Mr. Oakstone, but, more crucially, that it was the motivating force behind their actions.  Unlike *Pennington*, where it was evident that "the same decision" would have been made despite the retaliatory bias, 261 F.3d at 1270-71, here the evidence would suggest the opposite:  the admitted reason for Mr. Oakstone's schedule was to prevent conflict between Ms. Philbrook and Mr. Oakstone.  *See Def. Motion for Summ. J.* at 17 ("The outcome was Smith's proposal to compromise and allow Oakstone to work as a substitute expediter during the expedited times that Philbrook

---

[6] Similarly, in *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715 (6th Cir. 2004) and *Wallin v. THC-Chicago, Inc.*, No. 99-C-3173, 2004 U.S. Dist. LEXIS 19427 (N.D. Ill. Sept. 23, 2004), there was little evidence that the employee harboring animus against the Plaintiff was involved in the termination decision.  *See Noble*, 391 F.3d at 723 ("Lawrence and Ficorilli never worked together, and they met only once.  Noble presented no evidence showing that Lawrence and Ficorelli ever discussed Noble…nor is there any evidence that Lawrence had any role in Noble's termination"); *Wallin*, 2004 U.S. Dist. LEXIS 19427 at *32 ("Plaintiff agrees that Tse did not participate in the decision to fire her and was apparently unaware that this decision was even being considered").  *See also Webber v. Int'l Paper Co.*, 326 F. Supp. 2d 160, 166-67 (D. Me. 2004)("Mr. Webber agreed that there was no evidence that…the key decisionmaker, harbored any discriminatory animus, and there was no showing of discriminatory animus on the part of any of the individuals involved in the decision-making process…Mr. Webber made no argument that the reduction in force itself, or the decision to reduce the number of project engineers by two, was motivated by discriminatory animus.  Mr. Webber is left with a mixed bag of statements about his knees made over the course of his employment, which he hopes will somehow impart discriminatory animus to a decision made by a non-discriminatory decisionmaker.").  Compare *Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002): "if the ultimate decisionmaker was influenced by others who had retaliatory motives, then his investigation cannot in any real sense be considered *independent*." *Id.* at 346 n.2 (emphasis in original).

9

would not be at work"); *Def. Reply to Response to Mot. for Summ. J.* at 5 (Docket # 61)("The Postal Service concluded that there was a 'personality conflict' between the two employees and decided to exercise its discretion to keep them apart in order to avoid problems").

To support its claim that Ms. Philbrook had no power over Postal Service managers, the Defendant makes much of conflicts between Ms. Philbrook and management. Because a host of problems developed between management and Philbrook, so the Postal Service apparently reasons, she had no control over management and the final decisionmakers could not have acted as the conduit of her prejudice. *See Def. Motion for Summ. J.* at 17-20[7]; *Harlow v. Potter*, 353 F. Supp. 2d 109, 115 (D. Me. 2005). The Postal Service emphasizes, among other things, the meeting with management regarding the ELM during which Ms. Philbrook refused to accede to management's demands and joked around, her implied threat to instigate a lawsuit, and that she brought union representatives to meetings with management. *Def. Motion for Summ. J.* at 17-20.

The Postal Service points these incidents as examples of the lack of control Ms. Philbrook had over management. Mr. Oakstone, however, suggests that they in fact may show the opposite – the lack of control that management had over Ms. Philbrook. *Def. Reply to Response to Mot. for Summ. J.* at 11-12. The Court agrees with Mr. Oakstone that the logic here is somewhat puzzling. Ms. Philbrook's tone with management may indicate she knew or at least thought she had management in a bind. At the very least, Mr. Oakstone has presented a genuine issue of material fact for trial purposes.

Viewing the facts in a light most favorable to Mr. Oakstone, a reasonable fact-finder could determine that the Postal Service's actions in restricting Mr. Oakstone's work as an

---

[7] Page numbers refer to the unredacted, rather than the redacted version.

expediter were directly linked to and even controlled by Philbrook's gender-based animus – her utilization of a male stereotype in order to retaliate against him. Consequently, the motion for summary judgment is DENIED in respect to the sexual harassment claim.

### D.  Gender Discrimination

A *prima facie* case of sex discrimination requires the following:  (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and, (4) the position remained open or was filled by a person with similar qualifications.  *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002); *Kosereis v. Rhode Island*, 331 F.3d 207, 212-13 (1st Cir. 2003).  The First Circuit has described the showing for a *prima facie* case as "not onerous", a "small showing", and "easily made".  *Kosereis*, 331 F.3d at 213.  Assuming Mr. Oakstone can make such a showing, the burden then falls on the Postal Service to articulate a legitimate non-discriminatory reason for the challenged employment action.  *Texas Dep't of Commun. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

In its second argument, the Postal Service re-challenges this Court's finding the original finding that Mr. Oakstone could make his *prima facie* case, based on additional information learned in discovery.  In addition, the Postal Service also offers a non-discriminatory reason for any seemingly disparate treatment between arguably comparable employees.  Mr. Oakstone's gender discrimination claim centers on three junior female employees: May Brown, Sharlyn Parsons, and Mary McBreairty.[8]  The

---

[8] Mr. Oakstone concedes that Anita Parles and Vicky Silke had more seniority. DSMF at ¶ 43; POSMF at ¶ 43.

Postal Service argues that none of these was a comparable employee for Title VII purposes. *See Def. Motion for Summ. J.* at 21-22; *Reply to Pl.'s Opposition to the Mot. for Summ. J.* at 6.

The Court first examines the position of May Brown. Ms. Brown, as the Postal Service notes, worked fewer total hours as a substitute expediter during 1999 and 2000. *Def. Motion for Summ. J.* at 21. However, Ms. Brown did work more hours during the majority of 1999 when Mr. Oakstone's expediter duties were stymied. DSMF at ¶¶ 37-38. The Postal Service argues by way of explanation that the majority of those hours were gained when "Brown worked Saturdays as a regularly-scheduled work day". *See Def. Motion for Summ. J.* at 21. Because Ms. Brown was already at work and could perform duties at a regular rate of pay, whereas Mr. Oakstone would have had to have been paid overtime, the Postal Service argues that there was a legitimate non-discriminatory reason for these actions.[9] *Id.*

Once evidence of a legitimate non-discriminatory reason has been offered, the burden of production shifts back to Mr. Oakstone to establish the evidence is a pretext. *McDonnell,* 411 U.S. at 804; *Galvao v. Gillette Co*., No. 96-2062, 1997 U.S. App. LEXIS 21255, at *5-*6 (1st Cir. 1997). In his motion, Mr. Oakstone appears to have largely ignored the Postmaster's explanation of Ms. Brown's situation, but his opposing statement of material facts does challenge the assertion that the Postal Service's utilization of Ms. Brown was in line with its usual business practice. POSMF at ¶ 52. Citing the deposition of Jeff Clark, Mr. Oakstone notes that priority in assigning

---

[9] This argument is tenuous, because Mr. Oakstone denied the Postal Service's statement of material fact upon which it is principally based. *See* DSMF ¶ 52; POSMF ¶ 52. At this stage, the Court is required to view the evidence in a light most favorable to Mr. Oakstone, including that the Postal Service was not following its "actual practice" in favoring the regular shift employee over the call-in employee. POSMF ¶ 52.

expediter work in the Postal Service was given not to calling someone off their regular duty assignment, but to calling someone into work in a way that requires the payment of overtime.   The record reveals a genuine issue regarding the motivation behind Mr. Oakstone's treatment *vis-a-vis* Ms. Brown, and thus the question of gender discrimination will be preserved for trial.

Turning to Sharlyn Parsons, it is difficult to conclude, given her work-related disability, that she is "similarly situated" to Mr. Oakstone.  *See Perkins v. Brigham & Women's Hospital.,* 78 F. 3d 747, 751 (1st Cir. 1996)("the proponent of the evidence must show that the individuals with whom he seeks to be compared have 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it'").  Furthermore, Mr. Oakstone does not seem to challenge the Postal Service's characterization of Ms. Parsons as not similarly situated.  *Grenier v. Cyanamid Plastics, Inc*., 70 F.3d 667, 678 (1st Cir. 1995)("if a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived").

Mary McBreairty, however, is a different story.  During 1999-2000, Ms. McBreairty worked a total of 190 hours as an expediter to Mr. Oakstone's 300 hours.  Consequently, the Postal Service argues that "due to the fact that Oakstone worked vastly more hours than McBreairty, she is not a similarly situated employee for the purpose of proving pretext."  *Reply to Pl.'s Opposition to the Mot. for Summ. J.* at 6.  However, Mr. Oakstone's argument is not merely that Ms. McBreairty was given work in preference to him, but that she was given *training* in preference to him.  *Pl. Opposition to Mot. for Summ. J.* at 20.  Furthermore, the Postal Service fails to respond to Mr. Oakstone's

13

characterization of the issue:  it is not that Ms. McBreairty worked more hours, it is that she was offered the opportunity to work in preference to Mr. Oakstone when he was available for such work.  *Pl. Opposition to Mot. for Summ. J.* at 20 ("While Ms. McBreairty, who is junior to Mr. Oakstone, and Mike Dubay, who is senior to Mr. Oakstone, shared expediter duties…Mr. Oakstone was excluded from such duties").[10]

The record is sufficient to demonstrate that Ms. McBreairty and Ms. Brown could be considered similarly situated employees for Title VII purposes.  It is also sufficient to indicate that they were given expediter training and work opportunities ahead of Mr. Oakstone.  Consequently, Defendant's summary judgment motion inasmuch as it relates to gender discrimination is DENIED.[11]

### E.  Retaliation

A *prima facie* retaliation case requires Mr. Oakstone to show: (1) that he engaged in protected activity; (2) that he suffered subsequent adverse employment action; and, (3) a causal connection existed between the protected activity and the adverse action.  *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003).  The Postal Service in its motion assumes *arguendo* that Mr. Oakstone has asserted such a case.  *Def. Mot for Summ. J.* at 24.  Mindful of the Court's previous Order, in its current motion the Postal

---

[10] Mr. Oakstone's assertion that "the specific number of hours worked by each is a matter for trial", *see Pl. Opposition to Mot. for Summ. J.* at 20 is, as the Postal Service points out, somewhat mystifying, as these hours have been listed in the supporting statement of facts, which he has admitted.  *Def. Reply to Response to Mot. for Summ. J.* at 6.  It may be Mr. Oakstone is referring to the number of hours worked by Ms. McBreairty while he was available.

[11] Defendant also raises another point with regard to the gender discrimination issue.  Essentially, the Postal Service contends that Mr. Oakstone is wrong in his allegation that the Postal Service discriminates against men by (1) pointing out Ms. Philbrook's other problems with employees; and, (2) arguing that since Mr. Oakstone cannot identify any female Postal Service employee besides Ms. Philbrook who claimed she was unable to work in the same general area as a male employee, he cannot establish a pattern of behavior.  *Def. Mot for Summ. J.* at 23-25 (unredacted version).  Plaintiff essentially waives argument on the first point by stating it is of no controlling significance.  *Pl. Opposition to Mot. for Summ. J.* at 20.  As to the second, Mr. Oakstone's motion and statement of facts make clear that while he could not personally identify a comparable female employee with a hostile work environment claim, Chris Parker identified one for him. *Pl. Opposition to Mot. for Summ. J.* at 20-21 (unredacted version); POSMF at ¶¶ 285-86.

Service offers two legitimate non-discriminatory reasons: efficiency and the reasonable exercise of discretion. *Id.* at 24, 27; *Oakstone,* 332 F. Supp. 2d at 267-69.

In response, Mr. Oakstone runs once again through the elements of a *prima facie* case. *Pl.'s Opposition to the Mot. for Summ. J.* at 21-25. Since, however, the Postal Service had assumed *arguendo* at the outset of its argument that Mr. Oakstone could establish a *prima facie* case (the outcome of the previous Order), it responded by offering evidence of a legitimate non-discriminatory reason, as required by *McDonnell Douglas.* *See also Che*, 342 F.3d at 39l. Once such evidence was offered, the burden of production shifted once again, back to Mr. Oakstone to establish that the evidence was a pretext. 411 U.S. at 804. Mr. Oakstone, however, offers no argument to show that the Postal Service's proferred reasons were pretextual.

There is authority in this Circuit that such a failure is fatal. *See Beal Bank, SSB v. Pittorino,* 177 F.3d 65, 71 (1st Cir. 1999)("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace").[12] However, the Court again notes that Mr. Oakstone does deny several key facts on which the Postal Service relies in its assertion that efficiency is the reason for its actions, most significantly that his manual rack job was abolished because it was more efficient to put the mail through the LIPS. POSMF at ¶ 264; PSAMF at ¶ 375. Mr. Oakstone also qualifies the extent of the Postal Service's ability to exercise its discretion in assigning work. POSMF at ¶¶ 35, 51, 84. These statements, if true, support an allegation that the Postal Service's stated rationales were merely pretexts. Consequently, there remains a genuine issue of material fact and the Postal Service's motion for summary judgment on retaliation grounds is DENIED.

[12] This is the second argument Plaintiff failed to address. *See* discussion of May Brown, pg. 12-13.

### F.   Punitive Damages

Mr. Oakstone has demanded punitive damages against the Postmaster General.  *First Amended Complaint* at 15 (Docket # 5).  Punitive damages are not available against "a government, government agency or political subdivision" under Title VII.  42 U.S.C. § 1981a(b)(1).  The question is whether the Postal Service is "a government, government agency or political subdivision."  *Id.*  There is authority in this District that it is not.  *Roy v. Runyon,* 954 F. Supp. 368, 381-83 (D. Me. 1997); *Coffin v. Runyon*, No. 96-374-P-C, slip op. (D. Me. Oct. 20, 1997).   To arrive at his conclusions in *Roy* and *Coffin*, Magistrate Judge Cohen relied on:  (1) the character of the Postal Service as set forth in federal statute and explained in *Loeffler v. Frank,* 486 U.S. 549 (1988); (2) the "liberal construction" rule; (3) a analysis of the "government, government agency or political subdivision" language in § 1981a(b)(1); (4) the persuasiveness of Magistrate Judge Bobrick's opinion in *Baker v. Runyon,* 922 F. Supp. 1296 (N.D. Ill. 1996), *rev'd by* 114 F.3d 668 (7th Cir. 1997); and, (5) the absence of any other persuasive authority either in the First Circuit or elsewhere.  Viewed now with the accumulated benefit of eight years of intervening case law, the underpinnings of *Roy* and *Coffin* have been seriously eroded.

In *Loeffler*, the Supreme Court concluded that the Postal Service is liable for prejudgment interest on a Title VII sex discrimination claim.  *Loeffler,* 486 U.S. at 565.  This conclusion came against the backdrop of the "no-interest rule", which provides: "Apart from constitutional requirements, in the absence of specific provision by contract or statute, or 'express consent… by Congress,' interest does not run on a claim against the United States." *United States v. Louisiana,* 446 U.S. 253, 264-65 (1980)(quoting *United States v. N.Y. Rayon Importing Co.,* 329 U.S. 654, 659 (1947).  Pointing to the

"sue and be sued" provision of the 1970 act creating the Postal Service,[13] *Loeffler* concluded that prejudgment interest is allowable against the Postal Service as one of the "natural and appropriate incidents of legal proceedings," *Id.* at 555 (quoting *Reconstruction Finance Corporation v. J.G. Menihan Corp.,* 312 U.S. 81, 85 (1941).[14] In reaching its holding, *Loeffler* emphasized the "liberal construction" rule: "waivers by Congress of governmental immunity… should be liberally construed…." *Loeffler,* 486 U.S. at 554 (quoting *FHA v. Burr,* 309 U.S. 242, 245 (1940).

*Loeffler* also described the Postal Service as it emerged after 1970.  *Loeffler* noted that, in creating the Postal Service, Congress determined that it should "be run more like a business than had its predecessor, the Post Office Department." *Id.* at 556 (quoting *Franchise Tax Board of California v. USPS,* 467 U.S. 512, 520 (1984)).  It concluded: "By launching 'the Postal Service into the commercial world', and including a sue-and-be-sued clause in its charter, Congress has cast off the Service's 'cloak of sovereignty' and given it the 'status of a private commercial enterprise.'" *Loeffler,* 486 U.S. at 556 (quoting *Library of Congress v. Shaw,* 478 U.S. 310, 317 n. 5 (1986),  *superseded by statute as recognized in Landgraf v. USI Film Products*, 511 U.S. 244, 251 (1994)).

In *United States Postal Service v. Flamingo Indus. (USA) Ltd.,* 540 U.S. 736 (2004), the United States Supreme Court shed further light on the character of the Postal Service when it concluded that the Postal Service is not subject to federal antitrust laws.  In *Flamingo Industries*, the Supreme Court used the two-step analysis for immunity waiver determinations set forth in *FDIC v. Meyer,* 510 U.S. 471 (1994):  (1) whether there is a

---

[13] "The Postal Service shall have the following general powers: (1) to sue and be sued in its official name". 39 U.S.C.A. § 401(1).  *See also* 39 U.S.C.A. § 409.

[14] Elsewhere, *Loeffler* describes prejudgment interest as "an element of complete compensation".  *Loeffler,* 486 U.S. at 558 (quoting *West Virginia v. United States,* 479 U.S. 305, 310 (1987)).

waiver; and, (2) whether the agency is subject to substantive liability under the applicable law. *Flamingo,* 540 U.S. at 743 (Sherman Act); *Meyer,* 510 U.S. at 483 (*Bivens* action). Quoting 39 U.S.C. § 201, *Flamingo* noted that the Postal Service is "an independent establishment of the executive branch of the Government of the United States."  It said that the Postal Service is "part of the Government and that status indicates immunity unless there is a waiver."  *Flamingo,* 540 U.S. at 744.  Even though Congress made the Postal Service "amenable to suit, as well as to the incidents of judicial process", Congress did not "strip it of its governmental status."  *Id.*

The Postal Service emerges from *Loeffler* and *Flamingo* as something of a statutory chameleon, changing its character depending upon the legal backdrop.   However, *Flamingo*'s description of the Postal Service as being "part of the Government" and having "governmental status" allows it to blend within the concepts of "a government" or "governmental agency" under § 1981a(b)(1).  Clarified by *Flamingo,* the Postal Service's status as "part of Government" makes it unlikely even under *Loeffler* that punitive damages would be considered one of the "natural and appropriate incidents of legal proceedings."  *Loeffler,* 486 U.S. at 555.  Punitive damages are not like prejudgment interest (*Loeffler*), court costs (*Reconstruction Finance*), or garnishment (*Federal Hous. Admin. v. Burr,* 309 U.S. 242 (1940)), since they are only rarely allowed against governmental entities and when they are, they are commonly subject to significant statutory and judicial restriction.[15]   Punitive damages cannot, therefore, be said to be

---

[15] In addition to the exemption provided for the Government under civil rights provisions such 42 U.S.C. § 1981a(b)(1), a number of other federal statutes which allow for punitive damages expressly limit the ability to recover against the United States.  *See* 15 U.S.C.S. § 1691e(b)("Any creditor, other than a government or governmental subdivision or agency…shall be liable to the aggrieved applicant for punitive damages"); 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages").

among "the ordinary incidents of suits in such a business" 486 U.S. at 555 (quoting *Standard Oil Co. v. United States,* 267 U.S. 76, 79 (1925)), if the business is government.

More specifically, accepting *Flamingo*'s characterization of the Postal Service as "a government" or "governmental agency", Title VII expressly disallows punitive damages. Faced with this specific statutory exemption, it is a leap too far to construe the "sue and be sued" provision to open the Postal Service to the imposition of punitive damages. *See Harrell v. United States Postal Service,* 415 F.3d 700, 709 (7th Cir. 2005)("The 'sue and be sued' provision, if anything, indicates that 'waiver of sovereign immunity is necessary solely because the Postal Service is a government agency.")(quoting *Baker,* 114 F.3d at 670-71)).

Under the *Flamingo* analysis, the same result obtains. *Flamingo*'s first inquiry under *Meyer*, whether there is a waiver, is answered affirmatively in § 401(1), which "enacts a broad waiver of sovereign immunity for the Postal Service." *Currier v. Potter,* 379 F.3d 716, 724 (9th Cir. 2004). However, turning to the second *Meyer* inquiry, the substantive law of Title VII accords "a government" and a "governmental agency" immunity against punitive damages. Applying the language of *Flamingo,* because the Postal Service is "part of the Government", it is entitled to § 1981a(b)(1) immunity.

---

Justifications for limiting the assessment of punitive damages against the Government have largely concerned the burden that such damages would impose on taxpayers. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 263 (1981) ("In general, courts viewed punitive damages as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised."); *Vermont Agency of Natural Resources v. United States,* 529 U.S. 765, 785-86 (2000)(referring to the "presumption against imposition of punitive damages on governmental entities"); *Heritage Homes of Attleboro, Inc. v. Seekonk,* 670 F.2d 1,3 (1st Cir. 1982)("The [*Newport*] Court's concern with not imposing huge financial burdens on municipalities is equally applicable to § 1981...since the unlimited taxing power of a municipality can be taken into account in fashioning the amount of punitive damages, there is a likelihood of extremely large awards which would not only strain local treasuries but might also curtail public services.").

Finally, *Roy* and *Coffin* now stand alone against a growing avalanche of authority.[16] Every other court that has considered the issue has concluded otherwise. *Baker v. Runyon,* 114 F.3d 668, 670 (7th Cir. 1997), *cert. denied,* 525 U.S. 929 (1998)(no punitive damages against the Postal Service in Title VII action); *Robinson v. Runyon,* 149 F.3d 507, 517 (6th Cir. 1998)(Postal Service is "unequivocally" a government agency under Title VII); *Mathirampuzha v. Potter,* 371 F. Supp. 2d 159, 163 (D. Conn. 2005); *McMahon v. Henderson,* Nos. 00-351, 00-485, 2001 U.S. Dist. LEXIS 9236, at * 8 (D. Neb. June 5, 2001)(sovereign immunity bars claim for punitive damages in Title VII action against Postal Service); *Bunda v. Potter,* 369 F. Supp. 2d 1039, 1049 (D. Iowa 2005); *Gibson v. Henderson,* 129 F. Supp. 2d 890, 904 (M.D.N.C. 2001); *Jense v. Runyon,* 990 F. Supp. 1320, 1324 (D. Utah 1999)(Postal Service is a government agency exempt from punitive damages under Title VII); *Prudencio v. Runyon,* 3 F. Supp. 2d 703, 706-08 (W.D. Va. 1998); *Soto v. Runyon,* 13 F. Supp. 2d 215, 225 n.10 (D.P.R. 1998); *Ausfeldt v. Runyon,* 950 F. Supp. 478, 487-88 (N.D.N.Y. 1997); *Tuers v. Runyon,* 950 F. Supp. 284, 285 (E.D. Cal. 1996); *Miller v. Runyon*, 932 F.Supp. 276, 277 (M.D. Ala. 1996); *Cleveland v. Runyon,* 972 F. Supp. 1326, 1327-28 (D. Nev. 1997).

*Roy* and *Coffin* are tightly reasoned and well-expressed expositions, but they have been eclipsed by subsequent case law. This Court declines to follow *Roy* and *Coffin.* . Instead, this Court joins the other courts, which have unanimously concluded that punitive damages are not available in Title VII cases against the Postal Service.

---

[16] In *Coffin,* Magistrate Judge Cohen reiterated his view even after the Seventh Circuit reversed *Baker.* However, Judge Cohen concluded by saying that "in the absence of any other published opinion, and in the absence of authority in this circuit, I continue to believe that the analysis of this issue set forth in *Roy* is correct." Since Magistrate Judge Cohen issued *Coffin* in 1997, although the First Circuit has yet to resolve the issue, the decisional void has been filled elsewhere.

**III.   Conclusion**

The Postal Service's Motion for Summary Judgment is GRANTED to the extent

Plaintiff Oakstone asserts the right to the imposition of punitive damages against the

Postal Service.   The Motion is otherwise DENIED.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of October, 2005